_____

No. 95-2944
_____

United States of America,        *
                                 *
     Plaintiff - Appellee,        *
                                 *
          v.                       *
                                 *
John Monroe Kime, also           *
known as Jack Kime,              *
                                   *
     Defendant - Appellant.      *


_____                    Appeals from the United States
                                 District Court for the
          No. 95-3160                    Southern District of Iowa.
     _____


United States of America,        *
                                 *
     Plaintiff - Appellee,         *
                                   *
          v.                        *
                                 *
Randall Kirk Bell,               *
                                 *
     Defendant - Appellant.       *


                         _____

                    Submitted: March 13, 1996

                     Filed: October 25, 1996
                         _____

Before MORRIS SHEPPARD ARNOLD, FLOYD R. GIBSON, and HEANEY,  Circuit
Judges.
                         _____


FLOYD R. GIBSON, Circuit Judge.


     Jack Kime and Randall Bell were each convicted by a jury of drug
distribution, conspiracy, and firearm violations.  Kime

appeals his conviction.  Bell appeals his conviction and sentence.  We affirm in part and remand in part.

## I. BACKGROUND

In April of 1994, the Polk County Sheriff's Office in conjunction with federal law enforcement officials initiated wiretap and video surveillance of a suspected drug distribution ring headed by Jack Kime. The investigation culminated in the execution of multiple search warrants on the homes and businesses of various members of the conspiracy on May 12, 1994.  Kime and Bell were subsequently arrested and charged in a multi-count indictment along with Randy Groves, Clifford Brown, Joseph Ybarra, Joel Dodd, Dennis Smith, Dan Fedkenheuer, Bobby McGee, Donald Leach, Kelly Hilpipre, George Strable, and Daniel Davis, Jr.  Ybarra and Hilpipre entered into plea agreements but did not testify at trial.  The remaining codefendants, with the exception of Fedkenheuer who remains a fugitive, entered into plea agreements and testified at trial against Kime and Bell. Bell's former co-conspirators as well as numerous other witnesses testified as to Kime and Bell's involvement in the drug distribution scheme, including a series of armed robberies of fellow drug dealers perpetrated in the fall of 1994 for the purpose of obtaining drugs, capital, and firearms. Kime and Bell both testified in their own defense and denied any wrongdoing.

The jury convicted Jack Kime of one count of continuing criminal enterprise in violation of 21 U.S.C. § 848(a) and (c) (1994) (Count One); one count of conspiracy to possess with intent to distribute marijuana, cocaine, and methamphetamine in violation of 21 U.S.C. § 846 (1994) (Count Two); one count of distribution of methamphetamine in violation of 21 U.S.C. § 841(a)(1) (1994) (Count Three); two counts of possession with intent to distribute methamphetamine, cocaine, and marijuana in violation of 21 U.S.C. § 841(a)(1) (1994) (Counts Eight and Ten); and three counts of

using or carrying a firearm in relation to a drug trafficking offense in violation of 18 U.S.C. § 924(c)(1) (1994) (Counts Nine, Eleven, and Fourteen). Kime was sentenced to a total of seventy-five years imprisonment.

The jury convicted Bell of one count of conspiracy to possess with intent to distribute marijuana, cocaine, and methamphetamine in violation of 21 U.S.C. § 846 (1994) (Count Two); one count of possession with intent to distribute marijuana in violation of 21 U.S.C. § 841(a)(1) (1994) (Count Fifteen); and two counts of carrying or using a firearm in relation to a drug trafficking offense in violation of 18 U.S.C. § 924(c)(1) (1994) (Counts Fourteen and Sixteen). Bell was sentenced to a total of 55 years imprisonment.

## II. DISCUSSION

### A. JACK KIME'S ARGUMENTS:

### 1. Reasonable Doubt Instruction

Kime and Bell objected to the district court's proposed reasonable doubt instruction[1] based on Eighth Circuit Model Jury Instruction 3.11 and proposed the following additional sentence: "A reasonable doubt is one that fairly and naturally arises from the evidence or lack of evidence produced by the Government." The

---

[1]Instruction No. 16:

A reasonable doubt is a doubt based upon reason and common sense, and not the mere possibility of innocence. A reasonable doubt is the kind of doubt that would make a reasonable person hesitate to act. Proof beyond a reasonable doubt, therefore, must be proof of such a convincing character that a reasonable person would not hesitate to rely and act upon it. However, proof beyond a reasonable doubt does not mean proof beyond all possible doubt.

district court rejected Kime's proposed addition and elected to proceed instead with the unadorned version of the model instruction. Kime and Bell both claim error.

"We review the formulation of jury instructions by the district court for abuse of discretion." United States v. Parker, 32 F.3d 395, 400 (8th Cir. 1994). We find none. The jury instructions as a whole effectively communicated the defendants' point without the proposed addition to the reasonable doubt instruction: In particular, Instruction No. 13 instructed the jurors on the presumption of innocence, and Instruction No. 4 instructed the jurors to use their reason and common sense to draw deductions or conclusions from the facts established by the evidence. "The defendant is not entitled to a particularly worded instruction where the instructions given, when viewed as a whole, correctly state the applicable law and adequately and fairly cover the substance of the requested instruction." Id. This Court has repeatedly approved the particular reasonable doubt instruction in issue here, United States v. Simms, 18 F.3d 588, 593 (8th Cir. 1994), and while "such a lack of evidence instruction may be useful, the district court, in its discretion, may decline to employ it." United States v. Smith, 602 F.2d 834, 838-39 (8th Cir.), cert. denied, 444 U.S. 902 (1979).

### 2. Kime's Books

Among the evidence seized from Asphalt Maintenance & Repair, the conspiracy's cover business, were several incriminating books. Some of these publications were devoted to the subject of illegal drugs. These included: The Secret Garden, Marijuana, Manufacturing Methamphetamine, Marijuana Grower's Guide, Psychedelic Chemistry, and Construction and Operation for Clandestine Drug Laboratories. Other titles covered burglary and theft-related topics, such as: Techniques of Safecracking, Techniques of Burglar Alarm Bypassing, How to Make Your Own Professional Lock Tools, Vol. 1-4, Techniques

of Safe and Vault Manipulation, and The Complete Guide to Lockpicking by "Eddie the Wire."  These books were admitted into evidence over Kime's objection.  While Government witness and former co-conspirator Randy Groves testified that the books belonged to Kime, he also admitted that he had never seen any member of the conspiracy, including Kime, read the books and that some of them appeared to have never been opened.  Kime argues that these books should have been excluded under Fed. R. Evid. 403 because the risk of unfair prejudice greatly outweighed their probative value.  The Government argues that the books are at least probative of Kime's criminal intent, especially when viewed in conjunction with the additional evidence of the conspiracy's involvement in drug distribution and armed robbery.

Rule 403 of the Federal Rules of Evidence gives the district court discretion to exclude relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. Fed. R. Evid. 403.  We accord great deference to the district court's application of the Rule 403 balancing test and will reverse only for a clear abuse of discretion.  United States v. Rabins, 63 F.3d 721, 726 (8th Cir. 1995), cert. denied, 116 S. Ct. 1031 (1996).

Again we find no abuse of discretion.  The risk of prejudice from these inflammatorily-titled publications is very real, but we do not view it as unfair prejudice.  Whether or not Kime actually had the opportunity to read and exploit the techniques contained in these books, his mere possession of them is clearly probative of his criminal intent.  The drug-oriented publications obviously bear on his interest in the charged drug distribution and conspiracy crimes as "tool[s] of the drug-trafficking trade." United States v. Ford, 22 F.3d 374, 381-82 (1st Cir.) (admission of book entitled Secrets of Methamphetamine Manufacture in trial of defendant charged with distribution of cocaine and marijuana was relevant under Rule 401 and not unduly prejudicial under Rule 403), cert.

<u>denied</u>, 115 S. Ct. 257 (1994).

While the burglary-related publications would not ordinarily prove relevant in defining an individual's criminal intent to distribute drugs, that is not the case here. The record is rife with evidence indicating that the Kime organizations's modus operandi included the theft of rival drug dealers' product, proceeds, and firearms. As such, the possession of these books is further evidence of Kime's criminal intent in regard to this particular aspect of the charged conspiracy.

**3. Evidence of the Nelson Robbery**

Des Moines drug dealer James Nelson testified at trial that he had been pistol-whipped, shot in the arm, and robbed of approximately $30,000 by members of Kime's organization. Over defense objections, the district court admitted into evidence police photographs of the robbery scene at Nelson's house, photographs of the wounds inflicted on Nelson during the robbery, and Nelson's derringer. Kime argues that the district court abused its discretion by failing to exclude this evidence under Rule 403 because there was no relevant reason to admit this evidence other than to inflame the jury by showing them the bloody pictures of the violent assault.

We believe that this evidence was properly admitted as corroborating Groves, Brown, and McGee's testimony implicating Kime in the robbery. In addition, the photographs documenting Nelson's gunshot wound and head injuries were also probative of why Nelson misidentified Bell, who was indisputably incarcerated at the time of the robbery, as one of his assailants. Neither do we find this evidence particularly prejudicial as unduly gruesome or confusing. We find no abuse of discretion.

## 4. Disclosure of Confidential Informant 1

The affidavit in support of the Government's application for the interception of wire and oral communications contained the testimony of three confidential informants.  After the Government subsequently disclosed the identities of two of them, Kime moved for disclosure of the third, designated in the affidavit as CI-1.  The district court denied Kime's motion.  Kime argues that he was entitled to learn the identity of the third confidential informant in order to challenge the sufficiency of the affidavit used to procure the search warrant for the wiretaps and video surveillance.

We review the district court's pretrial ruling of whether to  compel disclosure of a confidential informant's identity for abuse of discretion. United States v. Harrington, 951 F.2d 876, 877 (8th Cir. 1991).  "The defendant bears the burden of demonstrating the need for disclosure, . . . and the court must weigh the defendant's right to information against the government's privilege to withhold the identity of its confidential informants." Id.  "There must be some showing that the disclosure [of the confidential informant's identity] is vital to a fair trial." United States v. Curtis, 965 F.2d 610, 614 (8th Cir. 1992).  This inquiry will necessarily turn on the particular facts of each case. Harrington, 951 F.2d at 877.

The district court found that Kime had not met that burden, and we agree.  It was never anticipated that CI-1 would be called to testify at trial, and he or she was not.  Kime argues that the disclosure of CI-1's identity was necessary to test the veracity of his or her testimony and, consequentially, the quantum of probable cause behind the affidavit offered in support of the Government's application for the interception of wire and oral communications.  But Kime offers no basis other than bald speculation for his assertion that such a disclosure and an opportunity to interview CI-1 would allow him to impeach CI-1's affidavit testimony.  The movant's burden "requires more than mere speculation that the

-7-

testimony of the informant might prove to be helpful to the defense." Curtis, 965 F.2d at 614. Even if such a disclosure would have been helpful to the defense on some level, there is nothing indicating it would have had a material effect on Kime's motion to suppress the intercepted communications. "In order to override the government's privilege of nondisclosure, defendants must establish beyond mere speculation that the informant's testimony will be material to the determination of the case." Harrington, 951 F.2d at 877. Kime has not met this burden by piling speculation on top of conjecture. Review of the affidavit shows that the testimony of CI-1 played a comparatively minor role and was not essential to the issuing judge's probable cause determination. Notwithstanding CI-1's testimony, we believe the testimony of the two disclosed informants standing alone would have sufficed to establish probable cause to issue the challenged warrant. See United States v. Dunlap, 28 F.3d 823, 825 (8th Cir. 1994) (affirming sufficiency of warrant notwithstanding challenged statements). We find no abuse of discretion.

**B. RANDALL BELLS'S ARGUMENTS:**

**1. Motion to Suppress**

On June 7, 1994, Bell and his female companion Sara Mullins drove up to a Des Moines residence where an arrest team consisting of federal and county law enforcement agents lay in wait. Bell was arrested at approximately 10:48 a.m. when he entered the residence. Mullins was simultaneously apprehended and taken into custody when a small amount of marijuana was discovered in her car. Bell and Mullins were immediately separated. After Bell had been searched, FBI Special Agent David Oxler issued Bell an oral Miranda warning as he was placed in a vehicle for transportation to the Des Moines Federal Courthouse. Sara Mullins was transported to the Polk County Jail in a separate vehicle. At 11:41 a.m., Special Agent Oxler and FBI Special Agent Bill O'Keefe interviewed Bell in his

holding cell.  Special Agent Oxler explained the charges to Bell and outlined the potential prison sentence facing him.  Special Agent Oxler then produced an advice of rights and waiver form which he read to Bell. Bell replied that he had been through the system before and knew his rights.  He then signed the waiver form and gave an incriminating statement to the agents.  At no time did Bell ask to terminate the interview or request an attorney.

Bell later moved to suppress his statement, claiming that his confession was coerced because the agents had told him that Mullins, who had allegedly told Bell that she was carrying his child, would go to prison for life if he did not confess.  Following an evidentiary hearing, the district court denied Bell's motion, concluding that his confession was voluntary under the totality of the circumstances, and a redacted version of Bell's statement was subsequently admitted into evidence at trial.  We review the voluntariness of Bell's confession de novo, but will uphold the underlying factual findings of the district court unless clearly erroneous. United States v. Bordeaux, 980 F.2d 534, 538 (8th Cir. 1992).

We are mindful that coercion may be mental as well as physical. Arizona v. Fulminante, 499 U.S. 279, 287 (1991) "The appropriate test for determining the voluntariness of a confession is whether, in light of the totality of the circumstances, pressures exerted upon the suspect have overborne his will." United States v. Meirovitz, 918 F.2d 1376, 1379 (8th Cir. 1990) (quotation omitted), cert. denied, 502 U.S. 829 (1991).  The two key factors in issue are the conduct of the law enforcement officials and the capacity of the suspect to resist the pressure to confess.  Id. Statutory factors bearing on the voluntariness of the confession include:

> (1) the time elapsing between arrest and arraignment of the defendant making the confession, if it was made after

arrest and before arraignment, (2) whether such defendant knew the nature of the offense with which he was charged or of which he was suspected at the time of making the confession, (3) whether or not such defendant was advised or knew that he was not required to make any statement and that any such statement could be used against him, (4) whether or not such defendant had been advised prior to questioning of his right to the assistance of counsel; and (5) whether or not such defendant was without the assistance of counsel when questioned and when giving such confession.

18 U.S.C. § 3501(b) (1994). A confession may not be found involuntary absent some type of coercive activity on the part of law enforcement officials. Russell v. Jones, 886 F.2d 149, 151 (8th Cir. 1989).

Special Agents Oxler and O'Keefe each denied ever having uttered the threats Bell attributes to them. In fact, Bell testified at the suppression hearing that when the agents handed him the waiver form, he asked if Mullins was "okay." One of the agents allegedly replied that she would be "out in a little while," and Bell thanked him politely. This exchange hardly seems consistent with Bell's version of events. The agents testified that Bell made no inquiries as to the well-being of Mullins during his arrest, transportation, or interrogation. In addition, Bell was fully advised of the crimes of which he was accused and the potential sentence facing him. Although he waived his right to counsel, Bell is by his own admission a hardened veteran of the criminal justice system who understood fully the scope of the rights he was waiving. Both agents testified that Bell appeared calm and undistracted during his interview. We conclude that the confession was voluntary under the totality of the circumstances.

**2. Motion to Sever**

Bell argues that the district court abused its discretion by denying his pretrial motion for severance. Bell essentially claims

that the spill-over effect from evidence against Kime denied him a fair trial. Specifically, Bell claims he was unfairly tarred by the vast majority of the evidence which was admissible only against Kime, and that had he been granted a separate trial, his alibi defense would have had more credence with the jury. We will not reverse the trial court's denial of a motion to sever absent a showing of real prejudice indicating an abuse of discretion. United States v. O'Meara, 895 F.2d 1216, 1219 (8th Cir.), cert. denied, 498 U.S. 943 (1990). "Persons charged with a conspiracy will generally be tried together, especially where proof of the charges against each of the defendants is based on the same evidence and acts." Id. at 1218. "Rarely, if ever, will it be improper for co-conspirators to be tried together . . . ." United States v. Drew, 894 F.2d 965, 968 (8th Cir.), cert. denied, 494 U.S. 1089 (1990).

To justify severance, the defendant must show "more than the mere fact that his or her chances for acquittal would have been better had he been tried separately." United States v. Horne, 4 F.3d 579, 590 (8th Cir. 1993), cert. denied, 114 S. Ct. 1121 (1994). What is required is an affirmative demonstration that the joinder prejudiced the movant's right to a fair trial. Id. Mere disparity of evidence against codefendants or the alleged prejudicial spillover effect of evidence against a codefendant are not grounds for severance absent a showing that the jury will be unable to compartmentalize the evidence against each individual defendant. O'Meara, 895 F.2d at 1219. Bell has made no such showing. In this case, the district court properly instructed the jury to compartmentalize the evidence bearing on each individual defendant's guilt. This trial, involving only two remaining codefendants, was neither too long nor complex to expect the jury to follow such an instruction. See United States v. Rodgers, 18 F.3d 1425, 1431-32 (8th Cir. 1994); United States v. Andrade, 788 F.2d 521, 530 (8th Cir.), cert. denied, 479 U.S. 963 (1986). We find no abuse of discretion.

### 3. Statutory Speedy Trial Claim

Bell next asserts that pretrial delay denied him his statutory right to a speedy trial under 18 U.S.C. § 3161(c)(1) (1994).  We will not address this claim, however, because Bell waived it by failing to make a pretrial motion for dismissal on speedy trial grounds.  United States v. Flenoid, 949 F.2d 970, 972 (8th Cir. 1991) ("A defendant's failure to move before trial for dismissal of an indictment on speedy-trial grounds, waives any remedy under the Speedy Trial Act.").

### 4. Limiting Instruction

During its case in chief, the Government offered a number of exhibits implicating mainly Kime.  These exhibits included papers and books seized from Kime's warehouse, items recovered from co-conspirator  Ybarra's apartment, photographs from the scene of the Nelson robbery, audio and video surveillance tapes, laboratory reports, logs from the interception of wire and oral communications, the .357 revolver used by Kime to pistol-whip and shoot Nelson, and Nelson's .45 derringer.  Bell argues that the district court erred by refusing to give a limiting instruction when these exhibits were admitted into evidence directing the jury to consider this evidence only against Kime.  We review the district court's failure to give a requested instruction for abuse of discretion.  United States v. Long Crow, 37 F.3d 1319, 1323 (8th Cir. 1994), cert. denied, 115 S. Ct. 1167 (1995).

This argument assumes that the aforementioned evidence was admissible exclusively against Kime.  Much of this evidence directly linked Bell to the charged conspiracy: Many of the disputed documents refer to Bell; several of the recorded audio tapes record conversations referring to Bell and his role in the conspiracy; portions of the photographic evidence depict Bell's comings and goings at the conspiracy's cover businesses; and many

of the intercepted conversations contained in the logs explicitly reference Bell and his role in the conspiracy. This evidence was admissible against Bell both to prove the existence of a conspiracy and his participation therein. See United States v. Brown, 941 F.2d 656, 660 (8th Cir. 1991) (once a conspiracy is established, even slight evidence connecting a defendant to the conspiracy, such as intercepted conversations and photographic evidence, may be sufficient to prove the defendant's involvement). While other exhibits bore more directly on Kime's guilt, much of it was similarly admissible against both codefendants as evidence of the existence and scope of the conspiracy for which they were both charged. United States v. Garrido, 995 F.2d 808, 816-17 (8th Cir. 1993) (evidence of drugs, drug paraphernalia, and weapon seized from home of first codefendant in drug conspiracy was admissible against second codefendant as evidence of charged conspiracy), cert. denied, 114 S. Ct. 331 (1993).

Rather than mechanically instructing the jury as to what evidence was admissible solely against Kime as opposed to Bell, we believe the district court properly relied on the jury's common sense, defense counsel's ability to conduct a vigorous cross-examination, and Instruction No. 4, which reminded the jury that there were two defendants on trial, each of whom was entitled to have his guilt determined solely on the evidence applying to him. This instruction fairly met the substance of the limiting instruction suggested by Bell and adequately safeguarded his right to a fair trial. Garrido, 995 F.2d at 817 (compartmentalizing instruction at end of trial instead of limiting instruction when evidence admitted was not abuse of discretion; jury was capable of reasonable compartmentalization); United States v. Watts, 950 F.2d 508, 513, (8th Cir. 1991) (same), cert. denied, 503 U.S. 911 (1992). We find no abuse of discretion.

**4. The <u>Brady</u> Claim**

Before trial, the Government informed the district court that it had become aware of a romantic entanglement between prosecution witnesses Brown, Dolash, and Groves and some of their female jailers. As a result, Brown, Dolash, and Groves apparently received several special privileges while in the Dallas County Jail, including sexual contact with female jailers, expanded visiting privileges with family members, catered food, and access to otherwise off-limits areas of the jail, computer records, areas outside the jail, and the control center. These irregularities, however, were not brought to the attention of the defense until midway through the cross-examination of Dolash, after Brown and Groves had already testified. Bell contends that the district court erred in denying his motion for a new trial based on the Government's failure to comply with the disclosure requirements set forth in <u>Brady v. Maryland</u>, 373 U.S. 83 (1963).

In <u>Brady</u>, the Supreme Court held that the Government's failure to disclose evidence that is both favorable to the accused and material to the accused's guilt or punishment violates due process. <u>Id.</u> at 87. <u>Brady</u> applies equally to evidence impeaching the credibility of Government witnesses as well as to exculpatory evidence. <u>Giglio v. United States</u>, 405 U.S. 150, 154 (1972). Evidence is material for purposes of <u>Brady</u> analysis "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. 'A reasonable probability' is a probability sufficient to undermine confidence in the outcome." <u>United States v. Bagley</u>, 473 U.S. 667, 682 (1985).

We find no <u>Brady</u> violation. "The rule of <u>Brady</u> is limited to the discovery, after trial, of information which had been known to the prosecution but unknown to the defense." <u>Nassar v. Sissel</u>, 792 F.2d 119, 121 (8th Cir. 1986) (quotation omitted). In this case,

-14-

the disclosure was made during defense counsel's cross-examination of Dolash, enabling him to cross examine Dolash extensively on the subject. In addition, the defense called one of the offending female corrections officers to the stand where she testified extensively on the issue, placing the facts squarely before the jury. The defense was also free to recall Brown and Groves in order to cross examine them on the subject as well. The fact that it chose not to do so does not render this temporary nondisclosure a Brady violation: "Brady does not require pretrial disclosure as long as ultimate disclosure is made before it is too late for the defendant to make use of any benefits of the evidence. Due process is satisfied." Nassar, 792 F.2d at 121.

## 6. Jojola's in-court identification

Jerry Jojola, the conspiracy's former New Mexico marijuana supplier, testified that he was robbed of his drugs by Bell, McGee, and Clifford Brown in Albuquerque. Prior to Jojola's testimony, Bell moved to suppress any potential courtroom identification on the basis that it would be unduly suggestive. The district court denied Bell's motion, and Jojola subsequently identified Bell at trial as one of his assailants. It is undisputed that Jojola had never been asked to make any sort of out-of-court identification prior to trial. Following the courtroom identification, Bell moved for a mistrial, which was denied.

In order to determine whether the courtroom identification denied Bell due process, we apply the two-part test set forth in Manson v. Brathwaite, 432 U.S. 98 (1977). First we must determine whether the identification was impermissibly suggestive. If it was, we then ask whether it created a "very substantial likelihood of irreparable misidentification" under the totality of the circumstances. Id. at 116 (quotation omitted). We need proceed no further than the first half of the test. The mere fact that Jojola's identification of Bell took place for the first time at

-15-

trial does not necessarily render it impermissibly suggestive. "Since this court does not require in-trial identifications to be preceded by pretrial lineups, see United States v. Wade, 740 F.2d 625, 628 (8th Cir. 1984), the only issue is whether [defendant's] presence at the defense table . . . constituted impermissibly suggestive procedures." United States v. Murdock, 928 F.2d 293, 297 (8th Cir. 1991). It did not. Bell, a male caucasian, was seated at defense table alongside his defense counsel, Kime, and Kime's defense counsel, all of whom are also male caucasians, as were the vast majority of individuals in the courtroom that day. This exact configuration had already, in fact, produced a prior in-court misidentification when Nelson wrongly identified Bell instead of Kime as one of the individuals who robbed and assaulted him. Based on these facts, we cannot say Jojola's in-court identification of Bell was impermissibly suggestive.

## 7. Expert Testimony on Eyewitness Identification

Following Jojola's courtroom identification of Bell, the district court refused to admit expert testimony impeaching the reliability of Jojola's identification. When faced with a proffer of expert scientific testimony, the district court must determine "whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." Daubert v. Merrell Dow Pharmaceuticals, Inc., 113 S. Ct. 2786, 2796 (1993). After a detailed offer of proof, the district court concluded that: (1) there had been no showing that the proffered testimony constituted "scientific knowledge" under the first prong of Daubert; (2) the proffered testimony would not assist the trier of fact under the second prong of Daubert because it invaded the province of the jury; and (3) the proffered testimony was likely to confuse the jury under Fed. R. Evid. 403. Instead, the district court subsequently gave the jury an instruction on eyewitness identification in order to assist the jury in evaluating the

eyewitness testimony.  Bell claims this decision was erroneous and denied him due process.

At the outset of this inquiry we note that "the district court has broad discretion in, first, determining the reliability of the particular testimony and, second, balancing its probative value against its prejudicial effect."  United States v. Blade, 811 F.2d 461, 465 (8th Cir.), cert. denied, 484 U.S. 839 (1987).  The exclusion of expert testimony is a matter committed to the sound judicial discretion of the trial judge, and we will reverse only for an abuse of that discretion.  United States v. Rose, 731 F.2d 1337, 1345 (8th Cir.), cert. denied, 469 U.S. 931 (1984).

We agree with the district court's assessment that the proffered expert eyewitness identification testimony fails to qualify as "scientific knowledge" under Daubert's first prong.  Daubert sets forth four factors which the district court should consider in determining whether the proffered expert testimony qualifies as "scientific knowledge."  These include: (1) whether the theory or technique can or has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate for error; and (4) the particular degree of acceptance within the scientific community.  Daubert, 113 S. Ct. at 2796-97.  Defense counsel submitted a preliminary opinion by Gary Wells, professor of psychology at Iowa State University, along with Dr. Wells' curriculum vita, and one article he had written and another he had cowritten on the topic of eyewitness identification in lineups.  While the articles admirably articulate Dr. Wells' theories and hypotheses regarding how to conduct a non-misleading pretrial lineup, they are utterly deficient in regard to determining whether his views constitute "scientific knowledge" within the meaning of Daubert.  Even assuming these articles are relevant in a case where no pretrial lineup was ever conducted, their reference to the research and/or studies upon which Dr. Wells' propositions and corollaries are

based consist of nothing more than the name of the researcher followed by the date of the study (i.e. "Wells, 1978."). Whereas this shorthand may communicate volumes to those in the field of psychology, it says nothing whatsoever to the district judge attempting to assess the credibility of the research underlying Dr. Wells' opinions. We are left in a situation analogous to that of the Ninth Circuit in United States v. Rincon, 28 F.3d 921, 923-25 (9th Cir.) (affirming the district court's exclusion of proffered expert eyewitness identification testimony under Daubert), cert. denied, 115 S. Ct. 605 (1994): "[W]hile the article identified the research on some of the topics, it did not discuss the research in sufficient detail that the district court could determine if the research was scientifically valid." Id. at 924. In short, the record supports the conclusion of the district court.

Even if the proffered testimony qualified as "scientific evidence" under the first Daubert hurdle, we agree with the district court's conclusion that it fails under the second phase of that inquiry. Federal Rule of Evidence 702 permits the use of expert testimony when "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." The advisory committee's notes make it clear that when the layman juror would be able to make a common sense determination of the issue without the technical aid of such an expert, the expert testimony should be excluded as superfluous. Fed. R. Evid. 702, advisory committee's note. And while Rule 704 has largely abrogated the bar against expert testimony on ultimate issues, "[t]he abolition of the ultimate issue rule does not lower the bars so as to admit all opinions." Fed. R. Evid. 704, advisory committee's note. Rules 702 and 403 still provide for the exclusion of "evidence which wastes time," such as "opinions which would merely tell the jury what result to reach." Id.

The evaluation of eyewitness testimony is for the jury alone. "It is the exclusive province of the jury to determine the believability of a witness . . . . An expert is not permitted to offer an opinion as to the believability or truthfulness of a victim's story." Bachman v. Leapley, 953 F.2d 440, 441 (8th Cir. 1992) (citation omitted). The proposed expert in this case "was not merely going to offer testimony about eyewitness identification in general but specific, to the point, testimony regarding the inherently untrustworthy manner with which Jojola identified Mr. Bell in Court." Appellant Bell's brief at 47. This line of testimony intrudes into the jury's domain. Bell's defense counsel was capable of exposing to the jury any potentially unreliable bases underlying Jojola's identification through cross examination, assuming they were not already apparent. See United States v. Harris, 995 F.2d 532, 535 (4th Cir. 1993) (affirming exclusion of proffered eyewitness identification expert testimony because "jurors using common sense and their faculties of observation can judge the credibility of an eyewitness identification, especially since deficiencies or inconsistencies in an eyewitness's testimony can be brought out with skillful cross-examination."). We believe the jury, as the trier of fact, to have been fully capable of gauging Jojola's credibility without the aid of an expert. United States v. Dorsey, 45 F.3d 809, 815 (4th Cir.) ("[E]xpert testimony can be properly excluded if it is introduced merely to cast doubt on the credibility of other eyewitnesses, since the evaluation of a witness' credibility is a determination usually within the jury's exclusive purview."), cert. denied, 115 S. Ct. 2631 (1995).

The minimal probative value of the proffered expert testimony is outweighed by the danger of juror confusion. Daubert makes it clear that when assessing the admissibility of proffered scientific expert testimony under Rule 702, the trial court must also take into account the interplay of other relevant rules of evidence, such as Rule 403: "Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of

this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses."  Daubert, 113 S. Ct. at 2798 (quotation omitted). Here the district court properly recognized the very real danger that the proffered expert testimony could either confuse the jury or cause it to substitute the expert's credibility assessment for its own.  Dorsey, 45 F.3d at 816 ("Because in the instant case, the district court was concerned that the expert testimony would confuse and mislead the jury, the district court did not abuse its discretion in excluding the testimony."); Rincon, 28 F.3d at 926 ("Given the powerful nature of expert testimony, coupled with its potential to mislead the jury, we cannot say that the district court erred in concluding that the proffered evidence would not assist the trier of fact and that it was likely to mislead the jury.").

Our conclusion is buttressed by three additional considerations: First, the district court adequately addressed the concerns presented by the excluded expert testimony by giving a comprehensive instruction regarding the evaluation and reliability of eyewitness testimony.  See Rincon, 28 F.3d at 925.  Second, the reality of the potential unreliability of eyewitness identification had already been driven home to the jury in a manner no expert could hope to reproduce by Nelson's prior in-court misidentification of Bell as one of his assailants.  Third, Jojola's eyewitness testimony is supported by that of numerous other witnesses, including McGee and Brown, both of whom implicated Bell as the third participant in the robbery.  We are "especially hesitant to find an abuse of discretion [in denying expert eyewitness identification testimony] unless the government's case against the defendant rested exclusively on uncorroborated eyewitness testimony."  Blade, 811 F.2d at 465.  As such, we find none.

**8. The _Bailey_ Claim**

Bell next challenges the sufficiency of the evidence supporting his conviction for using or carrying a firearm during and in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1). Bell stakes his claim on the Supreme Court's December 1995 decision in Bailey v. United States, 116 S. Ct. 501 (1995), holding that in order to sustain a conviction under the "use" prong of that statute, "the Government must show that the defendant actively employed the firearm during and in relation to the predicate crime." Id. at 509. Because Bell's trial took place in January of 1995, the district court was never afforded an opportunity to consider the facts in light of Bailey. Accordingly, we remand Bell's conviction under Count 16 to the district court for reconsideration in light of the Supreme Court's intervening clarification of the "use" component of 18 U.S.C. § 924(c)(1). See United States v. Byrne, 83 F.3d 984, 992 (8th Cir. 1996).

**9. Sentencing Issues**

Finally, Bell challenges the calculation of his sentence under the United States Sentencing Guidelines on three separate fronts.

**Base Offense Level:** In addition to 2,771.51 kilograms of marijuana, the district court attributed six pounds of methamphetamine to Bell based on the testimony of Groves, Brown, McGee, and Dolash, resulting in a base offense level of 32. Bell argues that because these individuals are former co-conspirators looking to trade testimony for leniency there is insufficient indicia of reliability to credit their testimony. The district court's determination of the amount of drugs for sentencing purposes is a finding of fact which we review for clear error. United States v. Lawrence, 915 F.2d 402, 406 (8th Cir. 1990).

The district court's findings regarding a witness' credibility are virtually unreviewable on appeal. United States v. Kinshaw, 71 F.3d 268, 272 (8th Cir. 1995). The record is replete with evidence linking Bell to the conspiracy's distribution of methamphetamine, and the district court "was entitled to rely on information having sufficient indicia of reliability to support its probable accuracy." Id. (quotation omitted). The mere fact that this testimony comes from Bell's former partners in crime does not necessarily render it unreliable. Id. (affirming calculation of amount of methamphetamine attributable to defendant based on codefendant testimony).

**Physical Restraint of the Victim:** The district court also enhanced Bell's sentence two levels under USSG § 3A1.3, which provides for an increase of two levels if the victim was "physically restrained in the course of the offense." Bell argues that this victim enhancement is inapplicable to Jojola because he was not a victim, but a fellow drug dealer and co-conspirator. Bell also challenges § 3A1.3's applicability because there is no evidence that he and his cohorts tied Jojola up or forced him into the van where he was robbed and beaten. We review this factual determination for clear error. Arcoren v. United States, 929 F.2d 1235, 1246 (8th Cir.), cert. denied, 502 U.S. 913 (1991).

While he may have initially entered the van willingly, Jerry Jojola testified that McGee and Bell pulled him into the back of the van, beat him severely, held a gun to his head, and held him down while Bell attempted to cut off his finger with a pair of wire cutters as a sign to the "Mexican Mafia." We find it to be axiomatic that once Brown, McGee, and Bell initiated the robbery and began beating and torturing Jojola, he ceased to be a co-conspirator and became a victim. And while USSG § 1B1.1(i) defines the term "physically restrained" to mean "the forcible restraint of the victim such as being tied, bound, or locked up," we have found that these terms are "merely illustrative examples and do not limit

the type of conduct that may constitute a physical restraint." <u>Arcoren</u>, 929 F.2d at 1246. Based on the above facts, we have no difficulty in affirming the district court's finding that Bell physically restrained Jerry Jojola within the meaning of § 3A1.3. <u>Arcoren</u>, 929 F.2d at 1246 (affirming district court's finding that defendant physically restrained victims within the meaning of § 3A1.3 by pushing and grabbing them and preventing them from leaving the room).

**c. Obstruction of Justice:** Bell also challenges the district court's two-level enhancement for obstruction of justice pursuant to USSG § 3C1.1 for perjuring himself at trial. We review the district court's application of a section 3C1.1 enhancement for clear error. <u>United States v. Cabbell</u>, 35 F.3d 1255, 1261 (8th Cir. 1994).

"In applying this provision in respect to alleged false testimony or statements by the defendant, such testimony or statements should be evaluated in a light most favorable to the defendant." USSG § 3C1.1, comment. (n.1). Accordingly, this enhancement should not be imposed if a reasonable trier of fact could have found Bell's alibi testimony to be true. <u>Cabbell</u>, 35 F.3d at 1261. Bell argues that this enhancement is inapplicable because a reasonable jury could have believed him and his alibi witnesses. While it is not enough that a defendant merely testifies in his own behalf and is disbelieved by the jury, we must give "due regard to the district court's observations and express finding that a defendant lied to the jury." <u>United States v. McCormick</u>, 29 F.3d 352, 357 (8th Cir. 1994).

In this case, the district court's findings include twelve specific instances where Bell's alibi testimony was flatly contradicted by either his own subsequently disavowed confession or the unequivocal testimony of his former co-conspirators or other witnesses. We find no error. <u>United States v. Oakie</u>, 12 F.3d

1436, 1444 (8th Cir. 1993) (affirming district court's perjury determination based on codefendant and other witnesses' testimony contradicting defendant's testimony).

## III. CONCLUSION

For the aforementioned reasons, we affirm Kime's conviction. We remand Bell's 18 U.S.C. § 924(c)(1) conviction under Count 16 to the district court for further proceedings in light of Bailey v. United States. We affirm Bell's conviction and sentence in all other respects.

MORRIS SHEPPARD ARNOLD, Circuit Judge, dissenting and concurring.

I concur in all of the court's opinion except the disposition of the issue that involves Bailey v. United States, 116 S. Ct. 501 (1995). The court's disposition of that issue is contrary to U.S. v. McKinney, 79 F.3d 106 (8th Cir. 1996), in which we held, under circumstances identical in all material respects to those present in this case, that we would not consider the defendant's Bailey argument because he had not presented it to the district court and had therefore forfeited it. I therefore respectfully dissent from the portion of the court's judgment that remands the case to the district court for reconsideration in the light of Bailey.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.