# United States Court of Appeals

## For the Eighth Circuit

_____

No. 21-3549

_____

United States of America,

*Plaintiff - Appellee*,

v.

Francisco Villanueva, also known as Gumby, also known as Pancho,

*Defendant - Appellant*.

_____

No. 21-3886

_____

United States of America,

*Plaintiff - Appellee*,

v.

Estevan Baquera, also known as Obama,

*Defendant - Appellant*.

_____

No. 22-1405

_____

United States of America,

*Plaintiff - Appellee*,

v.

Adan James Corona, also known as Ace Boogie,

*Defendant - Appellant*.
_____

Appeals from United States District Court
for the District of South Dakota - Western
_____

Submitted: May 7, 2024
Filed: September 16, 2024
_____

Before COLLOTON, Chief Judge, SHEPHERD and STRAS, Circuit Judges.
_____

COLLOTON, Chief Judge.

These appeals concern a criminal prosecution involving a murder in Indian country. Francisco Villanueva and Adan Corona were convicted at trial of first-degree murder and other offenses; they challenge their convictions. Estevan Baquera pleaded guilty to acting as an accessory to the murder after the fact; he appeals his sentence. We conclude that there is no reversible error, and affirm the judgments of the district court.[1]

_____

[1]The Honorable Jeffrey L. Viken, United States District Judge for the District of South Dakota, now retired.

I.

The crimes arose from a dispute over an alleged drug debt. Vincent Von Brewer III owed money to members of a gang known as the Eastside Oldies. In October 2016, Villanueva gathered a team of people to collect the money from Brewer. The group included Villanueva, Corona, Baquera, a juvenile with the initials H.C., and others.

The crew traveled in two cars and found Brewer at a community center in Pine Ridge, South Dakota. Brewer was present with his cousin, Jordan "Sky" Brewer, and two minors. The Villanueva group stopped the vehicles in front of Brewer. They got out with firearms in hand and their faces largely covered. The prosecution maintained that Villanueva and Corona fatally shot Brewer in the parking lot of the community center as he attempted to escape.

A grand jury charged Villanueva and Corona with two counts of murder in the first degree, *see* 18 U.S.C. §§ 2, 1111(a), 1152, conspiracy to commit assault with a dangerous weapon, *see id.* §§ 113(a)(3), 371, 1152, use of a firearm during a crime of violence, *see id.* § 924(c)(1)(A)(iii), and unlawful possession of ammunition as felons, *see id.* §§ 922(g)(1), 924(a)(2). The jury convicted them on all counts, and the court sentenced both to life imprisonment.

Baquera pleaded guilty to acting as an accessory to Brewer's murder after the fact. *See id.* § 3. Among other things, Baquera helped to disguise a getaway car by placing stolen license plates on the vehicle. At sentencing, the district court varied upward from the advisory guideline range of 78 to 97 months' imprisonment, and imposed the statutory maximum sentence of 180 months' imprisonment. The district court relied in part on a finding that Baquera pointed his firearm at the crowd to protect the gang members who committed the attack on Brewer.

II.

Villanueva first asserts that the district court erred when it allowed the prosecution to present Sky Brewer's eyewitness identification of Villanueva. At trial, Sky testified that one of the armed men did not cover his face. A few days after the murder, Brewer's sister showed Sky a photograph that she found on a Facebook page that was associated with the Eastside Oldies gang. Sky identified one of the three people in the photograph as the armed man whose face was not covered at the murder scene. Brewer's sister later identified the man in the photograph as Villanueva. At trial, Sky identified the attacker without the face covering as Villanueva.

Villanueva asserts that Sky's trial testimony resulted from an eyewitness identification procedure that was unduly suggestive. An eyewitness identification made under a police-arranged procedure that is suggestive and unnecessary may violate a defendant's right to due process if the procedure creates a substantial likelihood of misidentification. *Neil v. Biggers*, 409 U.S. 188, 201 (1972). The Due Process Clause, however, "does not require a preliminary judicial inquiry into the reliability of an eyewitness identification when the identification was not procured under unnecessarily suggestive circumstances arranged by law enforcement." *Perry v. New Hampshire*, 565 U.S. 228, 248 (2012).

The Due Process Clause is not implicated here. Sky identified Villanueva in a photograph that Brewer's sister displayed on her own initiative. There is no evidence that law enforcement officers arranged the display or had any involvement in Sky's identification of Villanueva. There was thus no error in allowing Sky's testimony.

Villanueva also asserts that the district court erred by excluding testimony of a defense expert, a psychologist who studies social cognition. In a pre-trial report, the expert opined that Sky's identification of Villanueva from the Facebook

-4-

photograph was "highly suggestive," and that Sky's courtroom testimony identifying Villanueva would be "highly unreliable." The district court excluded the expert's testimony because it would "invade the province of the jury and may well confuse the jury in performing its task of judging the weight and credibility of Sky's identification." Villanueva later suggested at a pretrial conference that the expert should redact her conclusion that "the identification should not be presented to the jury, by virtue of the unfairness associated with it," but did not specify what would remain of the expert's proposed testimony. At trial, after Sky and Brewer's sister testified about the identification of Villanueva, the defense shifted back and argued for allowing the expert to explain "the high likelihood and suggestivity associated with that identification," and "the interplay" between Sky and Brewer's sister regarding the photograph. The court adhered to its prior ruling, and Villanueva declined to make a further offer of proof.

This court has frowned on the use of expert testimony regarding the believability or reliability of a witness's identification testimony. In *United States v. Purham*, 725 F.2d 450 (8th Cir. 1984), this court affirmed exclusion of an expert who would have testified about "the inherent inaccuracies of eyewitness identification." *Id.* at 454. The court cited unfair prejudice that might have resulted because "the aura of reliability and trustworthiness that surrounds scientific evidence outweighed any small aid the expert testimony might have provided." *Id.* Similarly, in *United States v. Blade*, 811 F.2d 461 (8th Cir. 1987), the court affirmed the exclusion of a defense expert who would have testified "about the three-stage process involved in eyewitness identification," and "the psychological factors which prevent a witness from making an accurate identification." *Id.* at 464.

This court has since reiterated that "[t]he evaluation of eyewitness testimony is for the jury alone," *United States v. Kime*, 99 F.3d 870, 884 (8th Cir. 1996), that an expert may not offer an opinion about the trustworthiness of an eyewitness's identification testimony, *id.*, and that "[d]efense counsel is 'capable of exposing to

the jury any potentially unreliable bases underlying' the eyewitness identification 'through cross-examination.'" *United States v. Nickelous*, 916 F.3d 721, 724 (8th Cir. 2019) (quoting *Kime*, 99 F.3d at 884). We have noted by reference to other authorities that "the powerful nature of expert testimony, coupled with its potential to mislead the jury" are sound reasons to leave assessment of eyewitness identifications to the jury in light of direct and cross examination of the witness. *Kime*, 99 F.3d at 884 (quoting *United States v. Rincon*, 28 F.3d 921, 926 (9th Cir. 1994)). The court has been "especially hesitant" to require admission of expert testimony on identification "unless the government's case against the defendant rested exclusively on uncorroborated eyewitness testimony." *Id.* at 885 (quoting *Blade*, 811 F.2d at 465).

The district court's ruling on the expert's proposed testimony was in line with our precedents and did not constitute an abuse of discretion. We also reject Villanueva's contention that the case should be remanded for a hearing on the proposed expert testimony under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). The district court considered the expert's qualifications and her proffered expert report. The court afforded Villanueva an adequate opportunity to be heard on the proposed expert testimony. A further hearing was not required. *See Miller v. Baker Implement Co.*, 439 F.3d 407, 412 (8th Cir. 2006).

## III.

Villanueva and Corona next contend that the district court abused its discretion by declining a proposed jury instruction about the testimony of a cooperating juvenile witness. H.C. testified at trial that Villanueva and Corona shot Brewer. He also identified Baquera as a participant in the group that carried guns and assaulted Brewer. H.C. admitted that he carried a firearm and directed it toward the crowd while others confronted Brewer.

In an effort to impeach H.C., the defense elicited testimony that the government declined to move for transfer of H.C.'s case from juvenile court to adult court, and that the maximum sanction for prosecution in juvenile court was incarceration through H.C.'s twenty-first birthday. Before H.C. testified, the court instructed the jury that the government did not move for transfer, and that whether the testimony of a witness may have been influenced by the witness's hope of remaining in juvenile court is for the jury to decide.

At the close of the evidence, the defendants requested that the court include a final jury instruction regarding a cooperating juvenile witness. The instruction would have explained that the government's decision to proceed against H.C. as a juvenile exposed him to a maximum term of detention that was substantially less than the maximum applicable term if he had been charged as an adult. The instruction further would have stated that whether testimony of a witness may have been influenced "by his desire to please the government or to get prosecuted as a juvenile" is for the jury to decide.

The district court declined the proposed instruction. The court explained that the proposal would single out one witness's testimony as compared to others, and would cause the court to comment on the evidence in the case. The court concluded that other instructions adequately advised the jury about how to evaluate witness testimony.

We conclude that there was no abuse of discretion. The jury instructions already informed the jury that in weighing the evidence, the jury may consider whether testimony may have been influenced by a plea agreement or by the government's promise not to prosecute further. The court also referred the jury back to instructions given during the trial, including the specific instruction regarding H.C.'s testimony. The court directed the jury to consider all of the instructions as a whole. The instructions were therefore sufficient to inform the jury about how they

could weigh H.C.'s testimony in light of the government's decision to proceed against him only as a juvenile. The defendants were not entitled to a specific final instruction regarding juvenile accomplice testimony.

IV.

Corona challenges the district court's order denying his motion to suppress statements that he made to a police officer during a traffic stop and evidence derived therefrom. In 2016, an officer in Colorado stopped a vehicle in which Corona was a backseat passenger. The officer noticed that Corona appeared extremely nervous and that his eyes kept shifting directions. The officer suspected that Corona was a gang member because the stop occurred in a high-crime area where two street gangs were active, and Corona exhibited tattoos and clothing consistent with membership in the Eastside Oldies. The officer asked Corona for identification; he denied having documents and gave the officer a false name of "Jonathan Rojas."

When the officer learned that Corona had provided a false name, he removed Corona from the vehicle to conduct a protective pat-down search of his person for weapons. The officer noticed that Corona was shaking and sweaty despite the cold weather. The officer saw Corona looking around in a manner that led the officer to believe that Corona might flee. The officer then handcuffed Corona and walked him to the back seat of the patrol vehicle. The officer asked again for Corona's identity, and this time Corona provided his true name. Corona admitted that there were warrants for his arrest, and the officer asked whether there were any weapons in the vehicle. Corona disclosed that there was a firearm in the car; officers found the gun and seized it. Officers then returned to the patrol car and gave Corona the warnings prescribed by *Miranda v. Arizona*, 384 U.S. 436 (1966). Corona admitted that he had possessed the gun and concealed it in the car. Evidence at trial suggested that the firearm was used in the attack on Brewer.

Corona contends that the officer who questioned him during the traffic stop violated his rights by proceeding without giving the *Miranda* warnings. The warnings are required before an officer conducts an interrogation of a suspect who is in custody. A suspect is in custody when "there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (per curiam). The district court ruled that there was no violation of the *Miranda* rule.

Persons detained temporarily pursuant to ordinary traffic stops are not "in custody" for the purposes of *Miranda*. *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984). As with a suspect detained for an investigative stop under *Terry v. Ohio*, 392 U.S. 1, 30-31 (1968), *see United States v. Pelayo-Ruelas*, 345 F.3d 589, 592 (8th Cir. 2003), a traveler in a traffic stop is temporarily deprived of freedom of action, but he is not typically subjected to a degree of restraint that is associated with formal arrest. *Miranda* warnings are thus not required.

Corona's roadside detention falls within this rule. He was detained for only five minutes before informing an officer that there was a firearm in the vehicle. At that point, the detention was "temporary and brief" and was conducted at least some degree in public. *Berkemer*, 468 U.S. at 437-38. Although officers handcuffed Corona and brought him into the patrol car while checking identification, these measures did not amount to the functional equivalent of a formal arrest. We have held that neither handcuffing, *United States v. Rodriguez*, 711 F.3d 928, 935 (8th Cir. 2013), nor questioning in a patrol car, *United States v. Boucher*, 909 F.2d 1170, 1174 (8th Cir. 1990), necessarily triggers the *Miranda* rule. Under the circumstances with Corona, where handcuffs and venue were used briefly to protect officer safety and prevent flight, the combination does not present "the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Howes v. Fields*, 565 U.S. 499, 509 (2012); *see United States v. Paishon*, 854 F. App'x 162, 164-65 (9th Cir. 2021) (Collins, J., concurring). The initial five-minute phase of the

encounter was an ordinary traffic stop or *Terry* stop during which *Miranda* warnings were not required. The district court correctly denied Corona's motion to suppress.[2]

## V.

Baquera appeals his sentence. He argues that the district court relied on clearly erroneous facts and imposed an unreasonable sentence. In particular, he contends that the court clearly erred by relying on a finding that Baquera aimed his firearm at bystanders during the assault on Brewer. The court found that Baquera participated in the beating of Brewer and held a firearm on the crowd outside the community center to protect the gang members who carried out the attack. Because the court relied in part on H.C.'s testimony at the trial of Villaneuva and Corona, the parties agree that we should supplement the record on appeal to include that testimony. *See* Fed. R. App. P. 10(e).

We conclude that there was no clear error in the district court's finding that Baquera pointed a firearm at the crowd during the attack on Brewer. H.C. testified that Baquera carried an AK-47 rifle when he got out of a car at the community center. He testified that Baquera pointed his gun at Brewer and participated in beating Brewer before the fatal shooting. Baquera's presentence report, to which there was no objection, stated that when Baquera and others exited the vehicles at the community center, "[t]hey were all armed with firearms," and "[i]nitially, the group

---

[2]Because there was no custodial interrogation, we need not decide whether the narrow public-safety exception to *Miranda* recognized in *New York v. Quarles*, 467 U.S. 649 (1984), applies in this situation. *Cf. United States v. Becerra*, 958 F.3d 725, 730 (8th Cir. 2020) (holding that exception applied where arrestee already disclosed that he had a gun in his car, and officers saw a bulge in arrestee's pocket that could have been another gun); *United States v. Liddell*, 517 F.3d 1007, 1009-10 (8th Cir. 2008) (holding that exception applied where officers already found a firearm hidden in the suspect vehicle and were about to search the vehicle incident to an arrest).

pointed their firearms at a bystander." In his plea agreement, Baquera admitted that he "assisted in keeping anyone from approaching during the assault and murder of Brewer." It was reasonable for the district court to infer that Baquera was among "the group" that pointed firearms at a bystander while Baquera admittedly helped to keep anyone from approaching during the attack.

Baquera also argues that his sentence is unreasonable because it is not commensurate with sentences imposed on others involved in the attack on Brewer. The district court considered other offenders and made an explicit effort to avoid unwarranted disparities in sentencing. As to one offender who received the same sentence as Baquera, the court could not "parse out the difference" or "slice too finely," because "in terms of the behavior at the scene and the homicide of Vinny Brewer and the events that followed to avoid detection, there's not much difference." Another offender who provided one of the vehicles received a shorter sentence of nine years' imprisonment. But the government pointed out that the other offender did not assault Brewer, while Baquera participated in beating him before the shooting. In any event, "the statutory direction to avoid unwarranted sentence disparities, *see* 18 U.S.C. § 3553(a)(6), refers to national disparities, not differences among co-conspirators." *United States v. Fry*, 792 F.3d 884, 892 (8th Cir. 2015). The district court did not abuse its discretion in selecting a sentence.

\* \* \*

The judgments of the district court are affirmed. Baquera's motion to supplement the record is granted.

STRAS, Circuit Judge, concurring in part and concurring in the judgment.

In my view, whether Adan Corona was in custody when the officer asked him about the presence of weapons in the car is a close call. What is not close is the

application of *Miranda*'s public-safety exception, which justifies the question either way. As we have explained, "[n]o *Miranda* warnings [are] required [when] 'police officers . . . ask questions reasonably prompted by a concern for . . . public safety,' even when the potential threat is to the officers themselves." *United States v. Becerra*, 958 F.3d 725, 730 (8th Cir. 2020) (quoting *New York v. Quarles*, 467 U.S. 649, 656 (1984)).

The presence of a firearm in the car posed a potential threat to the officers. But it posed an even bigger threat to the car's occupants, including a toddler who had been sitting next to Corona in the backseat. *See United States v. Liddell*, 517 F.3d 1007, 1009–10 (8th Cir. 2008) (holding that the risk of injury from "mishandling . . . unknown firearms or drug paraphernalia" justifies asking about them even if *the suspect* can no longer reach them). The officer testified during the suppression hearing, in fact, that he asked the question out of concern for the toddler's safety, an "objectively reasonable" public-safety justification under the circumstances. *Id.* at 1009. I would start and end the analysis there.

_____