# In the Iowa Supreme Court

No. 23–2060

Submitted September 9, 2025—Filed November 14, 2025

**State of Iowa,**

Appellee,

vs.

**Pat Grant Kepner,**

Appellant.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Boone County, Ashley Beisch, district associate judge.

Challenge to the exclusion of a defendant's expert testimony in a criminal trial. **Decision of Court of Appeals Vacated; District Court Judgment Reversed and Case Remanded.**

May, J., delivered the opinion of the court, in which all justices joined except Mansfield, J., who filed a dissenting opinion.

Martha J. Lucey, State Appellate Defender, and Shellie L. Knipfer (argued), Assistant Appellate Defender, for appellant.

Brenna Bird, Attorney General, and Genevieve Reinkoester (argued), Assistant Attorney General, for appellee.

**May, Justice.**

Eyewitness identification testimony is a complicated topic. On the one hand, an eyewitness's identification can provide powerful evidence for the prosecution. Indeed, some say that "there is almost *nothing more convincing* [to a jury] than a live human being who takes the stand, points a finger at the defendant, and says 'That's the one!' " *Watkins v. Sowders*, 449 U.S. 341, 352 (1981) (Brennan, J., dissenting) (quoting Elizabeth F. Loftus, *Eyewitness Testimony* 19 (1979)). On the other hand, our court has acknowledged that "mistaken eyewitness identification" is "the primary cause for the conviction of innocent people in our criminal justice system." *State v. Folkerts*, 703 N.W.2d 761, 765 (Iowa 2005). Indeed, "DNA exoneration cases show the convictions of approximately seventy-five percent of innocent persons involved mistaken eyewitness identification." *Id.* (citing Gary L. Wells, *Eyewitness Identification Evidence: Science and Reform*, The Champion, Apr. 2005, at 12).

This mixture of potency and potential for error has led to much worry among judges. Some courts have even prohibited some eyewitness identification testimony. Many other courts have permitted criminal defendants to present expert testimony to educate jurors about the problems that can attend eyewitness identifications.

In this case, a criminal defendant named Pat Kepner offered that sort of expert testimony at trial. The district court excluded the testimony. Kepner was convicted. Now, on appeal, Kepner contends that the court abused its discretion by declining to admit the expert testimony.

We agree with Kepner. Under the particular circumstances of this case, the proffered expert testimony should have been allowed. Moreover, because eyewitness identifications of Kepner were important to the State's case against

him, we think the excluded expert testimony was important to Kepner's defense. So we are not confident that Kepner received a fair trial. And so we must reverse and remand for another trial.

**I. Procedural and Factual Background.**

In spring 2022, two women—K.W. and E.P.—made two separate reports to law enforcement. Each woman reported that a man whom she did not know had just exposed himself to her in a retail parking lot. This case is about those women's experiences, the investigations and trial that followed, and (especially) the women's identifications of Pat Kepner as the man they saw in the parking lots. We start with K.W.'s experience.

**A. The Hy-Vee Incident.** On March 30, 2022, K.W. drove her Mitsubishi SUV to the Hy-Vee in Boone. She arrived between 5 and 5:30 p.m. She pulled into a parking space with no cars on either side. She was still talking on her phone as she pulled in. Then something unusual happened. At trial, she explained the experience this way:

> Q. Could you tell the jury about that?
>
> A. A vehicle pulled up to my left. I looked over, seen somebody pull in. Didn't see anything at the time, because people pull in and you naturally look over at them. And then I continued on the phone for probably five minutes. And then when I got off of the phone, I went to get out of my car, and then he had no pants on, or they were to his knees.

K.W. then left her vehicle and walked to the front of the store. After the man drove away, K.W. went into the store and completed her shopping. K.W. then called a friend to talk about what she should do about the parking lot incident. The friend said she should report the incident to law enforcement. K.W. followed that advice by calling 911.

The 911 dispatcher assigned Boone County Deputy Rose to follow up with K.W. Rose spoke to K.W. later on the evening of March 30. K.W. provided Rose with the facts we've already discussed. Because she did not know the man in the parking lot, she was unable to provide his name. She described him as a white male, maybe in his 40s, and possibly balding. She described the man's pants as light-colored gym shorts—"white, gray, silver." Silver was also the color of the man's car, a sedan from the 2000s. K.W. was unable to provide a license plate number, though.

Following up on K.W.'s information, Rose obtained surveillance video for the Boone Hy-Vee parking lot for the period of 4:30 to 6:30 p.m. on March 30. Because of blind spots in the surveillance, Rose was unable to see the incident described by K.W. Rose also did not see Kepner in the parking lot. But Rose did locate a silver passenger vehicle in the video. Rose noticed three unusual features about the vehicle. First, the license plate seemed somewhat bent. Second, there was some discoloration on the front bumper. Finally, the car had an unusual stance in that the rear appeared to sit lower than the front. (Later, when Rose learned that Kepner was a suspect, Rose went to Kepner's house. At Kepner's house, Rose found a silver sedan that also had those three unusual features.)

**B. The Gym Incident.** Deputy Rose conveyed K.W.'s report to a detective with the Boone Police Department named John Mayse. And then, about a week after the Hy-Vee incident, Mayse took an initial report from a different woman, E.P. On the morning of April 5, E.P. had driven her SUV to a gym in Boone. As she was leaving the gym, she had an unusual experience with a man whom she did not know. At trial, E.P. would describe it this way:

Q. Okay. Could you tell us what happened?

A. I went to my car, and I got on my phone to check some messages, and out of the corner of my eye I saw a motion. I looked

over, and I saw this man masturbating in his car, and I looked back to my phone.

Soon after, the owner of the gym showed up. E.P. went over to the gym owner and told him what had happened. She asked him to wait with her until the man left. Before the man's car got out of sight, though, E.P. and the gym owner worked together to figure out the license plate number of the man's car, which E.P. would later describe as a "silver, older sedan, four-door, with a sunroof."

That same day, E.P. met with Detective Mayse to explain what had happened. E.P. told Mayse that she thought the perpetrator's silver car had a license number of TAP265. But the gym owner thought the license number was TAG625. At that time, though, Iowa was not yet using "T" as the first letter for license plates. So neither proposal matched with an actual plate. However, police research revealed that a similar-looking number—IAP625—matched with an older silver Camry sedan. That sedan was registered to Kepner.

**C. Mayse's Follow-Up Investigation.** Mayse and his colleagues then created a six-photo array. They started by obtaining Kepner's photo from the Iowa Department of Transportation. Then they obtained photos of five similar-looking people from the Boone County jail. Finally, the backgrounds of the photos were altered to make them more similar.

Mayse took this photo array to K.W. and showed it to her. K.W. was unable to pick out a person from the array.

Mayse also showed the array to E.P. And E.P. pointed to Kepner's photo.

Mayse then visited Kepner at his home. Mayse asked about the gym incident that E.P. had reported. Kepner did not acknowledge going to that gym. But he did admit to shopping at stores nearby.

While Mayse was talking with Kepner, Mayse's bodycam was recording. This produced video footage of Kepner talking.

Mayse took that video footage to K.W. and E.P. Each of them told Mayse that the man in the video was the man they had seen exposing himself.

Mayse then had a second conversation with Kepner, this time at the police station. Mayse asked Kepner if he was involved in either incident. Kepner never definitively said that he wasn't. But Kepner provided reassurances about avoiding any similar problems in the future. "[S]omething to the effect of: I promise I won't do anything to have this conversation again."

**D. The Charges.** The State charged Kepner with two counts of violating Iowa Code section 709.9(1) (2022), which makes it a serious misdemeanor to expose ones "genitals or pubic area to another" person if the exposure is done "to arouse or satisfy the sexual desires of either party" and if the exposer "knows or reasonably should know that the act is offensive to the viewer." The two counts were based on the two separate incidents involving K.W. and E.P.

**E. The Eyewitness Testimony.** At trial, the State presented testimony from the law enforcement officers—Rose and Mayse—as well as the eyewitnesses, K.W. and E.P. We focus here on the testimony of K.W. and E.P.

Each of them described their experiences in the parking lots, their reports to police, their experiences with Mayse's six-photo array, and their experiences with the video that Mayse showed them. And each of them identified Kepner, who was in the courtroom, as the man they had seen exposing himself.

K.W. and E.P. each made some concessions during cross-examination. For instance, K.W. conceded that her testimony that Kepner's car had a sunroof was based on seeing his car around town long after the Hy-Vee incident. It wasn't something she had remembered from the incident itself. Likewise, E.P. conceded

that her accounts of the gym incident had sometimes been inconsistent. For example, although she testified that the man's penis was erect, she had told police that she did not know if it was.

During their redirect examinations, though, both K.W. and E.P. were certain about Kepner's guilt. Here is an excerpt from K.W.'s testimony:

> Q. As you sit here in front of this jury, is there any doubt, any, in your mind that the person who exposed his genitals to you is the defendant?
>
> A. It is him.
>
> Q. No doubt?
>
> A. No doubt.

And this is from E.P.'s testimony:

> Q. As you sit here now, a year and a half removed, as you look at the defendant, is there any doubt in your mind that he's the same man that parked next to you and was masturbating next to you?
>
> A. There's no doubt.

**F. The Offer of Proof.** In preparation for trial, Kepner's defense counsel had retained Dr. Kim MacLin as an expert witness. Dr. MacLin is a psychologist with expertise in sensation, perception, and memory in law-related contexts. The defense retained Dr. MacLin to testify about factors that can influence the reliability of eyewitness identifications.

Prior to trial, the State moved in limine to exclude or greatly limit Dr. MacLin's testimony. At that time, the court declined to make a definitive ruling. But the court invited the defense to make an offer of proof during trial so that the specific nature of Dr. MacLin's potential testimony would be clear. Consistent with the court's direction, the defense made its offer of proof after the State rested. The offer was made primarily through questioning of Dr. MacLin outside of the presence of the jury.

Dr. MacLin explained that lineups, photo arrays, and "even police interviews with witnesses are all forms of collecting memory evidence." And scientific research has yielded policies and procedures "about how questioning should be done and how photo arrays . . . should be conducted to produce a more reliable piece of memory evidence." For instance, Dr. MacLin explained, because a photo array "is a test of memory" for the witness, the ways that the photos are selected and administered to the witness "all matter in terms of the type of identification you're going to get," i.e., an identification that is "trustworthy and reliable" or one that is "unreliable or even [a] false identification."

She also gave examples of how improper selection of photos can lead to problems with photo array identifications. Problems might arise if the "filler photos"—the photos of people who *aren't* the suspect—don't match the witness descriptions as well as the suspect's photo. Problems can also arise when all the photos don't look roughly equivalent, such as when there are differences in the positions of the faces or the lighting, or if "the source of the filler photos is different than the source of the suspect photo." These subtle differences can be noticeable to a witness who is confronted by the array and, indeed, may draw the witness toward a particular photo in a way that "feels like recognition" and makes them "inclined to make an identification because it feels like memory" even though there is really just an issue with the photos themselves.

Dr. MacLin also noted that there are two "scientifically and practically acceptable" ways for presenting photos. One is a "simultaneous photo array" in which several photos are presented "all at once," such as the traditional "six-pack of photos." The other is to "present the photos sequentially," which means presenting them one at a time by showing the first photo, then removing

it, then showing the next photo, then removing it, and so on "until you get through the series."

Dr. MacLin also stressed the importance of "fairly scripted" initial instructions that should be given to witnesses before the photos are presented. Witnesses should be told that they are going to see a set of photos, and they should be informed about the manner in which the photos are going to be presented. Then, "very importantly," the witness should be told this:

> We will pursue investigation regardless of what you say here today. It is as important to exclude innocent people as it is to identify people that might have been involved.

This instruction is "critically important," Dr. MacLin explained, because it "release[s] the witness from that expectation that they have to make a choice." Conversely, if the instruction is not given, witnesses "become choosers."

> They become inclined to choose because they feel, like, well, I wouldn't be here unless they were already really sure and I better choose someone. And these sort of unconscious thought processes influence choosing in such a way that we know that it increases false identifications.

Dr. MacLin also testified that the identity of the test administrator matters. "[I]deally[,] the administrator of the photo array should be blind to who the suspect is," i.e., they should not know which photo is the suspect's. This is important because "just like in poker, people convey a tell." In other words, if the administrator knows who the suspect is, he or she "can inadvertently communicate" that information to the witness.

Also, if the administrator knows who the suspect is, he or she may "inadvertently praise or shame" the witness's choice through "subtle, conversational, and body language" cues. This can lead to problems with future identifications because "if it has been communicated to the witness [that] they have made a good choice by selecting" a particular person, that praise can

"inflate[] [their] confidence in the decision" in a false way. In other words, they may become more confident because of the "feedback they received" from the array administrator rather than their genuine confidence in their own choice.

This ties in to Dr. MacLin's larger concerns about multiple identifications by the same witness. "[M]emory is malleable," she explained, meaning it "does change over time[;] [a]nd in particular with identifications, we know that people's confidence in their decision can change over time." Specifically, a witness's confidence in their identification "may be lower initially," but "we will then often see an increase" in their confidence "over time through repeated questioning[] [and] repeated identification procedures . . . all the way up to trial." By the time they testify at trial, then, they may present as "compelling, helpful witnesses" because they have become very confident in their identification. And yet, Dr. MacLin noted, "we know also from the scientific literature that confidence does not equate to accuracy."

**G. The Ruling.** After hearing the offer of proof and the parties' arguments, the court concluded that Dr. MacLin's testimony should be excluded. The court noted that although the proposed testimony did not "directly" address witness credibility, "it certainly is indirectly talking about the credibility of witnesses, and that's just not allowed from expert testimony." Dr. MacLin's observation that "confidence doesn't equal accuracy," for instance, is a matter within the "purview of the jury" and "not in the purview of expert testimony."

The court considered permitting only Dr. MacLin's testimony concerning "general practices" for photo arrays. But the court did not believe that that testimony could be separated from Dr. MacLin's impermissible observations "about memory and about credibility of witnesses."

In the end, the court concluded that Dr. MacLin's testimony "would confuse the jury" and include "indirect[] talk[] about the credibility of witnesses, which is just not allowed." So the court excluded the testimony.

**H. The Defense Case.** With Dr. MacLin's testimony out, the defense was left with three witnesses. Cathy Smith, a day care provider, testified that Kepner picked up his children at 5:10 p.m. on March 30. That would have been near the time when K.W. said she saw Kepner at Hy-Vee.

Kepner's wife, Sarah, verified that Kepner had planned to pick up the children on March 30. And she testified that on April 5, Kepner was wearing dark denim jeans—not the light-colored shorts described by E.P.

Kepner also testified. He denied exposing himself on March 30 or April 5. He also testified to finding another silver sedan in the area that looked similar to his. And it had a similar license plate—IAP655.

**I. A Rebuttal Witness.** On rebuttal, the State called Michael Kline—the owner of the silver sedan with plate IAP655. Kline testified that he did not expose his genitals to any women in spring 2022.

**J. Verdict and Sentence.** Ultimately, the jury found Kepner guilty on both counts of indecent exposure. The district court entered a suspended jail sentence.

**K. Court of Appeals and Further Review.** Kepner appealed. We transferred his case to the court of appeals. The court affirmed. Kepner sought further review, which we granted.

**II. Scope and Standard of Review.**

When our court grants further review, we have discretion to address any of the issues that were properly raised in the appeal. *State v. Miller*, 4 N.W.3d 29, 34 (Iowa 2024). Here, Kepner's appeal presents a single issue: Should the district

court have admitted the testimony of Dr. MacLin? We review that issue for abuse of discretion. *State v. Schutz*, 579 N.W.2d 317, 320 (Iowa 1998) (en banc).

**III. Merits.**

**A. Admissibility.** Our rules of evidence govern the admission of expert testimony. Generally, experts may testify from their "scientific, technical, or other specialized knowledge" if the testimony "will help the trier of fact to understand the evidence or to determine a fact in issue." Iowa R. Evid. 5.702.

Our state is "committed to a liberal view" when deciding whether expert testimony will assist the trier of fact. *State v. Stendrup*, 983 N.W.2d 231, 238 (Iowa 2022) (quoting *Ranes v. Adams Lab'ys, Inc.*, 778 N.W.2d 677, 685 (Iowa 2010)). At the same time, we have insisted that the district court exclude expert testimony about things that the jury can fully understand without the help of an expert. For instance, in *State v. Krogmann*, we found that a sheriff should not have been allowed to testify that "the only reason to shoot a person would be to take their life." 998 N.W.2d 141, 156 (Iowa 2023). The jury needed no help in deciding the intent behind "pointing a gun at someone at close range and firing it three times." *Id.*

Here the question is whether Dr. MacLin's testimony could have helped a jury in evaluating K.W. and E.P.'s eyewitness identifications. Our approach to this sort of testimony has changed over time. We first considered the issue through our 1979 decision in *State v. Galloway*, a murder case that arose from a shooting. 275 N.W.2d 736, 737 (Iowa 1979) (en banc), *abrogated by*, *Schutz*, 579 N.W.2d 317. The State presented evidence that—three years after the shooting—two witnesses had selected a photograph of the defendant from an array presented by law enforcement. *Id.* The defendant's psychologist was allowed to testify that there was a " 'real possibility' of misidentification of a

murderer . . . three years after the crime." *Id.* at 738. But the psychologist was not allowed to testify about a particular study on eyewitness memory. *Id.* at 739.

The jury found the defendant guilty. *Id.* at 737. On appeal, we reversed the conviction based on an instructional issue. *Id.* at 738. Then we went on to consider the district court's treatment of the psychologist's testimony. *Id.* Our court was divided on how the testimony should have been treated and, by extension, how it should be treated on remand. *Id.* at 739; *id.* at 741 (Reynoldson, C.J., concurring specially). The author of the majority opinion concluded that all of the testimony could have been properly admitted. *Id.* at 739 (majority opinion). One other justice joined this approach. *Id.* at 740. But seven other justices took the opposite view. *Id.* (Reynoldson, C.J., concurring specially). As to that issue, then, the seven-justice special concurrence was the opinion of the court. *Id.* at 743.

The specially concurring justices observed that although "commentators urge that experts like" the psychologist "should be permitted to testify in order to demonstrate the general unreliability of the memory of identification witnesses[,] . . . research has produced not a single appellate decision in which such expert testimony was held admissible or its exclusion held to be an abuse of discretion," and indeed "[c]ases to the contrary are legion." *Id.* at 740–41 (citations omitted). "The predominant rationale for excluding such testimony which emerges from these cases is that the subject of the opinion offered is not beyond the knowledge and experience of a juror." *Id.* at 741. Consistent with this approach, the seven-justice *Galloway* special concurrence opined that on retrial, the trial court "would be justified in sustaining an objection" that the psychologist's "opinion is not a proper subject of expert testimony." *Id.*

Almost twenty years passed before we addressed the issue again in *State v. Schutz*, 579 N.W.2d at 319. *Schutz* arose from a robbery at a McDonald's. *Id.* at 318. The only evidence against the defendant was the testimony of six eyewitnesses. *Id.* Prior to trial, Schutz had asked for a continuance to obtain an expert to testify about the reliability of eyewitness testimony. *Id.* The district court denied the motion because—under *Galloway*—"such testimony is not permitted in Iowa." *Id.* But the defendant challenged *Galloway* both in the district court and on appeal. And our court found this challenge meritorious (two dissenters aside). *Id.* at 320; *id.* at 321 (Carter, J., dissenting). We observed that five years after *Galloway*, the Supreme Court of California held that it was an abuse of discretion to exclude expert testimony as to various psychological factors that may affect eyewitness identifications. *Id.* at 319 (majority opinion) (citing *People v. McDonald*, 690 P.2d 709, 726 (Cal. 1984) (en banc), *overruled in part and on other grounds by, People v. Mendoza*, 4 P.3d 265 (Cal. 2000)). And we noted California's conclusion that "although jurors may not be totally unaware of psychological factors bearing on eye witness identification, the body of information now available on these matters was 'sufficiently beyond common experience' that in appropriate cases expert opinion could assist the trier of fact." *Id.* at 320 (quoting *McDonald*, 690 P.2d at 721). We also pointed to a number of other post-*Galloway* opinions in which expert testimony was held admissible "or its exclusion was held to be an abuse of discretion." *Id.* And "[w]e found no state appellate court other than Iowa with a per se rule of exclusion of expert testimony regarding eye witness identification." *Id.* Given all these developments, we concluded that "the per se rule adopted by *Galloway* must be reversed." *Id.* Instead, we said that "[t]he exclusion of expert testimony is a matter committed

to the sound discretion of the trial court and we will reverse only for an abuse of that discretion." *Id.*

In the almost three decades since *Schutz*, we have not had an opportunity to explore the boundaries of that discretion. But we think at least two post-*Schutz* developments shed useful light. First, the pro-admission trends in other jurisdictions have continued in the years since *Schutz. See, e.g., State v. Doolin*, 942 N.W.2d 500, 511 (Iowa 2020) (citing *Commonwealth v. Walker*, 92 A.3d 766, 782–83 (Pa. 2014) (collecting cases), and noting that "[o]ther courts have recognized that expert testimony may be an appropriate method to address concerns regarding the reliability of eyewitness identifications"). The Supreme Court of Pennsylvania cataloged forty-four states plus the District of Columbia as jurisdictions that "have permitted such testimony at the discretion of the trial judge." *Walker*, 92 A.3d at 782–83. The court also noted that "all federal circuits that have considered the issue, with the possible exception of the 11th Circuit," have also "embraced this approach." *Id.* at 783.

Meanwhile, in Iowa, we have had several opportunities to explore the possible usefulness of expert testimony when jurors are asked to evaluate reports by humans who have experienced highly unusual circumstances. *See, e.g., State v. Allen*, 565 N.W.2d 333, 338 (Iowa 1997) (holding that the psychologists' testimony about the "effects of [a witness's] mental condition on her ability to tell the truth" was permissible to "help the jury understand the evidence it heard about [her] mental illnesses").

For instance, in cases involving allegations of child sexual assault, we have permitted some kinds of expert testimony but rejected others. On one hand, we have said it is an abuse of discretion to permit expert testimony about whether a child witness is attempting to honestly report what occurred. *State v. Dudley*,

856 N.W.2d 668, 677 (Iowa 2014). Vouching of this kind is not helpful to the jury in performing its functions. Instead, vouching is an impermissible infringement on the jury's role to decide which witnesses are being honest and which are not. Expert vouching can also be confusing because it involves an expert "giving his or her scientific certainty stamp of approval" on particular testimony "even though an expert cannot accurately opine when a witness is telling the truth." *Id.*

Likewise, an expert may not "indirectly vouch that the victim was telling the truth" by setting out symptoms of "sexual abuse trauma" and then explaining that the "child's physical manifestations or symptoms are consistent with" those symptoms. *Id.* This sort of "consistent with" testimony is an indirect path to the same result: expert vouching that may confuse the jury and, in any event, infringes on the jury's role. And we have rejected it, as have many sister jurisdictions. *Id.* at 681 (Waterman, J., concurring specially); *accord State v. Jaquez*, 856 N.W.2d 663, 665 (Iowa 2014) ("By opining M.M.'s demeanor was 'completely consistent with a child who has been traumatized, particularly multiple times,' Kay was vouching for the credibility of the child.").

All the same, we have recognized that expert testimony "can be very beneficial to assist the jury in understanding some of the seemingly unusual behavior child victims tend to display." *Dudley*, 856 N.W.2d at 675 (citing Veronica Serrato, Note, *Expert Testimony in Child Sexual Abuse Prosecutions: A Spectrum of Uses*, 68 B.U. L. Rev. 155, 163 (1988)).

> Juries may have misconceptions regarding how an abused child should behave. A child may appear frightened on the stand or unwilling to testify. The child's recollection of the events may seem inconsistent, or the child may have delayed reporting the abuse for quite some time. An expert witness, such as a psychologist or social worker, can help the jury understand these behaviors and other

behaviors common to children who have suffered sexual abuse trauma.

*Id.* at 675–76 (citations omitted).

Accordingly, we have approved the admission of an expert's general opinions that may assist the jury in evaluating child victim behavior, including child victim testimony. *State v. Montgomery*, 966 N.W.2d 641, 655–56 (Iowa 2021) ("Yet *Dudley* would not bar Dr. Jones-Thurman's expert testimony that child victims *generally* may conflate their memories of abuse."). For instance, in *State v. Payton*, we approved the admission of a therapist's general observations concerning delayed reporting by sex abuse victims where the therapist did not offer any specific opinion about the alleged victims in the case. 481 N.W.2d 325, 327 (Iowa 1992). More recently, in *State v. Leedom*, we found that a prosecutor did not engage in misconduct by eliciting generalized testimony from expert Colleen Brazil about child abuse and how it is reported. 938 N.W.2d 177, 193 (Iowa 2020).

> In our view, Brazil's testimony did not vouch for H.M.'s credibility. Brazil's testimony was general in nature describing why children delay disclosure, the grooming process, why children have an inability to recall specific dates, and the possibility that others can be in the room when abuse occurs. Brazil did not treat H.M. or meet with her on any occasion. Brazil never used H.M.'s name or referenced her. Brazil did not offer her opinion regarding H.M.'s truthfulness or specifically testify that H.M.'s behavior was consistent with the behavior of abuse victims generally. Brazil did not connect H.M.'s experience to the research that she relayed in her testimony. Brazil's generalized testimony is permissible under our precedent. Therefore, the prosecutor's elicitation of Brazil's testimony did not amount to prosecutorial misconduct.

*Id.*

We think the same approach should govern expert testimony about eyewitness identifications that are made in connection with criminal investigations and prosecutions. Just as juries may have misconceptions about

how abuse can impact the behavior of children, juries may also have misconceptions about how memory works in the context of investigative processes and, indeed, how those processes can alter a witness's perceptions of their own memory, e.g., increasing the witness's confidence through repeated identification processes and reassuring feedback from investigators. Therefore, just as juries may be assisted by an expert's generalized observations about how child abuse can impact child behavior, juries may also be assisted by an expert's generalized observations about eyewitness identifications and the impact of investigative techniques. Ordinarily, this sort of generalized testimony should be admitted where, as here, a criminal prosecution relies in part or whole on a witness's eyewitness identification.

Applying these principles here, we see no grounds for exclusion of Dr. MacLin's testimony. Dr. MacLin is a psychologist, and she sought to testify about psychological science. Her testimony would have provided the jury with scientific insights about how different investigative methods can impact both the reliability of witnesses' identifications and the witnesses' confidence in their own identifications. These matters are not native to the everyday lives of ordinary people. Rather, these are matters "sufficiently beyond common experience" that expert guidance could be helpful to a jury. *Schutz*, 579 N.W.2d at 320 (quoting *McDonald*, 690 P.2d at 721).

Moreover, much like the expert testimony we approved in *Leedom*, Dr. MacLin's testimony would have only provided the jury with general principles. *See* 938 N.W.2d at 193. Dr. MacLin did not offer to testify about any witness's identification of anyone. Dr. MacLin did not claim familiarity with those identifications. Dr. MacLin never mentioned the names of K.W., E.P., or the officers with whom they interacted. Dr. MacLin never connected the general

principles she described with the particular facts of this case. And Dr. MacLin never offered an opinion about the validity of the witnesses' identifications or the specific processes used with those witnesses. Rather, Dr. MacLin's testimony was wholly generalized. And so, as in *Leedom*, Dr. MacLin's testimony was proper.[1]

We have considered the district court's concern that a witness should not testify about the credibility of another witness. We recognize that that remains the general rule. *See Dudley*, 856 N.W.2d at 677. As explained, though, this rule does not categorically bar expert testimony about the psychological factors that can impact the accuracy of eyewitness identifications or the confidence that eyewitnesses have in their identifications. The district court erred in concluding that such testimony was categorically inadmissible even where, as here, the proffered expert would have spoken only about general principles and would not have ventured into direct or indirect vouching. *See Leedom*, 938 N.W.2d at 193. This categorical approach was a misapplication of the law and, therefore, an abuse of discretion.

We have also considered the court of appeals suggestion that the admissibility of expert testimony like Dr. MacLin's should depend on whether the eyewitness's testimony has been corroborated by other evidence. We recognize that some other courts have taken similar views. *See, e.g., Johnson v. State*, 526 S.E.2d 549 (Ga. 2000) (stating that trial courts cannot exclude expert testimony when identification is essential and there is no corroborating evidence); *People v. Santiago*, 958 N.E.2d 874, 881 (N.Y. 2011) ("If . . . sufficient evidence corroborates an eyewitness's identification of the defendant,

---

[1] We do not exclude the possibility that an eyewitness identification expert could offer testimony that was more specific than Dr. MacLin's. Because that sort of testimony is not before us, however, we do not decide its admissibility.

then . . . testimony concerning eyewitness identifications is unnecessary . . . ." (citation omitted)), *abrogated by, People v. Vaughn*, 258 N.E.3d 1159 (N.Y. 2024).

We take a different view. The jury's job was to evaluate the evidence presented. That evidence included the testimony of the two eyewitnesses on whom the State's case was based. And Dr. MacLin's testimony could have helped the jurors in evaluating the eyewitnesses' testimony. Therefore, Dr. MacLin's testimony would fulfill rule 5.702's requirement that expert testimony must "help the trier of fact to understand the evidence or to determine a fact in issue." Iowa R. Evid. 5.702. That would be true regardless of whether the eyewitnesses' testimony was corroborated or not. And so, as one commentator put it, the availability of corroborative evidence is generally "irrelevant to the admissibility analysis." Matthew Bova, *The Court of Appeals Should Abandon the Corroboration Rule Governing the Admissibility of Expert-Identification Testimony*, 24 CUNY L. Rev. 62, 63–64 (2021); *see also State v. Guilbert*, 49 A.3d 705, 738 (Conn. 2012) ("[W]e do not believe that a defendant should be precluded from presenting such testimony merely because the state has presented other evidence of guilt that the jury reasonably could credit."); *In re L.C.*, 92 A.3d 290, 297 (D.C. 2014) (holding that the availability of "corroborative evidence was irrelevant to the question of the admissibility of" expert testimony on the reliability of eyewitness identifications).

This is not to say that an expert witness is needed in every case that involves an eyewitness. For instance, if there were no dispute that the eyewitness and the defendant knew each other before the crime—that they were not strangers—then the factors mentioned by Dr. MacLin might not be relevant or useful. And there could also be other good reasons why a particular expert's

testimony might not be admissible because of case-specific concerns. *Cf.* Iowa R. Evid. 5.403. The district court is well suited to address such concerns.

Under the particular facts before us, though, we conclude that the district court abused its discretion by excluding Dr. MacLin's testimony.

**B. Prejudice.** Our analysis is not done. A criminal defendant is only entitled to a fair trial, not a perfect trial. So even when evidence has been erroneously excluded, we do not automatically order a new trial. Rather, we order a new trial "only if the exclusion affected a substantial right of a party." *State v. Buelow*, 951 N.W.2d 879, 890 (Iowa 2020); *see* Iowa R. Evid. 5.103(*a*). All the same, in the case of nonconstitutional error, "we presume prejudice—that is, a substantial right of the defendant is affected—and reverse unless the record affirmatively establishes otherwise." *State v. Sullivan*, 679 N.W.2d 19, 30 (Iowa 2004) (emphasis omitted); *see, e.g.*, *McGrew v. Otoadese*, 969 N.W.2d 311, 325 (Iowa 2022) (reversing because of the erroneous exclusion of expert testimony and noting that "[w]e presume prejudice and reverse unless the record affirmatively establishes otherwise" (quoting *Eisenhauer ex rel. T.D. v. Henry Cnty. Health Ctr.*, 935 N.W.2d 1, 19 (Iowa 2019))).

In this case, the record does not "affirmatively establish" that Kepner's substantial rights were not affected. *See id.* At Kepner's trial, the identity of the perpetrator was hotly disputed. In fact, it was the only dispute. Dr. MacLin's testimony was aimed directly at that dispute. And when an evidentiary error "directly addresses a hotly contested central dispute of the parties, it is harder for us to find" that the error wasn't prejudicial. *Tarbox ex rel. S.K. v. Obstetric & Gynecologic Assocs. of Iowa City & Coralville, P.C.*, 13 N.W.3d 546, 563 (Iowa 2024) (quoting *State v. Skahill*, 966 N.W.2d 1, 16 (Iowa 2021)).

Similarly, when the State has told the jury that particular evidence is especially important, we are reluctant to say that errors relating to that evidence are unimportant. *Id.*; *Skahill*, 966 N.W.2d at 17. Here, the State greatly emphasized the importance of the two eyewitnesses' identifications. The State did so from the beginning of the trial to the end. *See McGrew*, 969 N.W.2d at 326 (declining to find harmless error in part because of "the closing arguments," which are "often a barometer of how the case was tried and whether the presence or absence of certain evidence mattered").

In its opening, the State told the jury that although there would be a variety of evidence presented, "Ultimately, it will boil down to hearing from [K.W.] and [E.P.] . . . . And after you see them, hear them, listen to them, point to the defendant and say 'That's the guy,' that's all you will need."

Then, at the start of its closing argument, the State again emphasized the importance of those "two grown women subject to cross-examination, getting in this chair and saying that's the guy." Later, the State doubled down:

> But this case is about -- boils strictly down to identification. And you heard two grown women come into this courtroom and say that's the guy. Court's instructed you twice, find the truth and do justice. So the truth is it was the defendant. He's had his day in court. And justice demands a guilty verdict on both counts.

Finally, in its rebuttal argument, the State once more emphasized: "This case is about [K.W.] and [E.P.]. This case is about the fact that their testimony alone is enough. . . . This case is about believing [K.W.] and [E.P.]."

Of course, the State also presented and discussed other evidence, such as the similarities between Kepner's car and the car that witnesses saw. Even so, we can't say that that other evidence was so overpowering that K.W.'s and E.P.'s identifications were unimportant. Therefore, we can't say that Dr. MacLin's testimony was unimportant.

We recognize also that the jury received a special instruction on the reliability of eyewitness identifications. The instruction stated:

INSTRUCTION NO. 10

The reliability of eyewitness identification has been raised as an issue. Identification testimony is an expression of belief or impression by the witness. Its value depends on the opportunity the witness had to see the person at the time of the crime and to make a reliable identification later.

In evaluating the identification testimony of a witness, you should consider the following:

1. If the witness had an adequate opportunity to see the person at the time of the crime. You may consider such matters as the length of time the witness had to observe the person, the conditions at that time in terms of visibility and distance, and whether the witness had known or seen the person in the past.

2. If an identification was made after the crime, you shall consider whether it was the result of the witness's own recollection. You may consider the way in which the defendant was presented to the witness for identification, and the length of time that passed between the crime and the witness's next opportunity to see the defendant.

3. An identification made by picking the defendant out of a group of similar individuals is generally more reliable than one which results from the presentation of the defendant alone to the witness.

4. Any occasion in which the witness failed to identify the defendant or made an inconsistent identification.

While this instruction may have had value,[2] it did not provide the jury with the same information that Dr. MacLin would have. For instance, Dr. MacLin would have explained that before a police investigator shows a photo array to an

---

[2]The parties do not question the propriety of this instruction, which is the current version of the Iowa State Bar Association's (ISBA) Criminal Jury Instruction 200.45 (2025). In *State v. Booth-Harris*, we rejected a challenge to the 2015 version of that instruction. 942 N.W.2d 562, 577–78 (Iowa 2020). The ISBA added prefatory language after *State v. Booth-Harris*, but the rest of the instruction remained the same.

eyewitness, the investigator should explain that "[w]e will pursue investigation regardless of what you say here today" and, in addition, "[i]t is as important to exclude innocent people as it is to identify people that might have been involved." Dr. MacLin would have also explained that failure to give this instruction could make the witness feel like a "chooser"—someone who *has to* pick one of the photos. The jury instruction didn't provide that information.

Also, and unlike the jury instruction, Dr. MacLin would have specifically warned jurors that a witness's confidence may have been artificially enhanced and, in any event, may not be a reliable measure of the witness's accuracy. This sort of warning could have been particularly valuable to Kepner in light of the great confidence exhibited by both K.W. and E.P. Both said they had "no doubt" that Kepner was the perpetrator.

**IV. Disposition.**

The district court abused its discretion by excluding the testimony of Kepner's expert witness. And the record does not affirmatively establish that Kepner received a fair trial nonetheless. Therefore, we must reverse for retrial.

**Decision of Court of Appeals Vacated; District Court Judgment Reversed and Case Remanded.**

All justices concur except Mansfield, J., who files a dissenting opinion.

**Mansfield, Justice (dissenting).**

I respectfully dissent. On the law, I agree that Dr. Kim MacLin should have been permitted to testify. On the facts, I would find that the defendant was not prejudiced by the exclusion of her testimony.

To begin with, no one contends that two different people committed these two acts of indecent exposure six days apart. Both complaining witnesses—K.W. and E.P.—saw a middle-aged man who had light-colored gym shorts, sitting in his car near them in a parking lot in Boone, with his genitals exposed, looking at them. The car was an older silver-colored four-door sedan with a sunroof.

When the vehicle drove off from the gym, the gym owner and E.P. attempted to get a license plate number. The gym owner thought it was TAG625, E.P. thought it was TAP265. Pat Kepner has a silver-colored four-door with a sunroof whose license plate is IAP625. On the photos introduced at trial, the "I" looks close to a "T."

Moreover, surveillance video recorded the car that was involved in the incident at the grocery store. Although no license plate number can be seen in the video, the car is an exact match to Kepner's. It's a silver-colored four-door sedan with a sunroof, a wrinkled license plate, front bumper discoloration, and the back of the car hanging lower than the front. All of these were distinctive features of Kepner's Toyota Camry.

True, the defense proved at trial that there was a similar silver-colored four-door sedan with license plate IAP655. But that car's owner didn't resemble the individual who had exposed himself to K.W. and E.P. Also, his car lacked the sunroof and other distinctive features that are visible in the grocery store

surveillance video. In closing argument, the defense abandoned any argument that the owner of the other car could have been the perpetrator.

At trial, both K.W. and E.P. identified Kepner as the person who had exposed his genitals to them. Understandably, their identifications were not airtight. At the time of the incidents, they found his behavior very distasteful and were trying not to gratify the exposer by staring at him.

Thus, K.W. was unable to pick the defendant out of a photo array, but she identified him from later interactions with him and his vehicle in town. E.P., after some initial difficulty, picked the defendant out of the same photo lineup. Both confirmed their identifications later when they saw the bodycam video (without sound) of Officer Mayse speaking briefly to Kepner at his house.

Also bolstering the case against the defendant was his own interview at the police station, which was shown to the jury. During the interview, the defendant offered everything *but* a direct denial of the allegations. He said he didn't know why K.W. and E.P. saw him with his shorts down. He then went on as follows during the course of the interview:

> After I spoke to you last time, I wondered how far away you'd have to be from my car to see in, and you gotta be pretty close.
>
> . . . .
>
> I certainly don't want to make anyone uncomfortable. I genuinely feel that most people do the right thing…I definitely don't want to give anyone any reason of concern or stress. I can't explain it. If I've got to start going to the grocery store in a hoodie-footie, I'll do that. I've never been in trouble. I've never been accused of anything. This is new ground for me.
>
> . . . .
>
> I want you to know that . . . there will be no question, if I have to wear a parka, Iowa heat be damned, there won't be any question.
>
> . . . .

I can promise you I'm not gonna do another thing to have another conversation.

Based on the foregoing, in my view, the State had a strong case against Kepner. The question then is whether the testimony of Dr. MacLin would have made a difference. She would have testified that the best practice is to use a photo array in which the photo of the suspect doesn't stand out. Also, she would have testified that the best practice is to tell the witness that the investigation continues regardless of what they say and that it is as important to exclude innocent people as to include people who might have been involved. Ideally, according to Dr. MacLin, the person handling the photo array should not know who the suspect is. Finally, Dr. MacLin would have testified as to the malleability of memory—that people can become more confident in an identification over time even though that does not mean the identification is more accurate.

While all of this is a fair subject for expert testimony, I don't believe it would have changed anything here. The photo array in this case was high-quality. The individuals looked alike, the backgrounds were the same, and Kepner's photo didn't stand out. And in any event, the jury learned that K.W. wasn't able to make an identification from that photo array.

Moreover, unlike in many other cases, the defense had access to video recordings of exactly what transpired when the photo arrays were shown to K.W. and E.P. If the defense thought those videos were helpful, they could have introduced them into evidence. Finally, the eyewitness identifications were only *part* of the State's case. Critical to that case, and ultimately unexplained by Kepner, was the presence of his vehicle.

Finally, a note of concern. I do not believe eyewitness identification experts are needed in many cases, and fewer still are the cases where denial of such an expert should result in reversible error. *See United States v. Villanueva,*

116 F.4th 813, 818 (8th Cir. 2024) ("The court has been 'especially hesitant' to require admission of expert testimony on identification 'unless the government's case against the defendant rested exclusively on uncorroborated eyewitness testimony.'" (quoting *United States v. Kime*, 99 F.3d 870, 885 (8th Cir. 1996))). The majority opinion, though, does not suggest the existence of any limits. Will we now see defense requests for eyewitness identification experts in every case where identity is at issue and a witness made an identification?

For the reasons stated, I would affirm Kepner's convictions and sentence.